Filed 4/1/26  P. v. Ceja CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARCADIO CUAHTEMOC CEJA,<br><br>    Defendant and Appellant. | F087949<br><br>(Super. Ct. No. BF182940A)<br><br>**OPINION** |

-ooOoo-

        APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

        Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Dina Petrushenko and Matthew A. Kearney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Arcadio Cuahtemoc Ceja molested his girlfriend's niece for several years starting when she was six years old. He was convicted by a jury of multiple sex offenses and sentenced to an indeterminate term of 105 years to life plus a determinate term of 10 years eight months.

On appeal, Ceja contends: (1) the trial court abused its discretion and violated Ceja's right to due process by allowing him to remain in feet and leg restraints without an on-the-record showing of manifest need; and (2) the court prejudicially erred by admitting evidence of Ceja's suicide attempt while in custody.

We affirm.

## PROCEDURAL BACKGROUND

On March 6, 2024, the Kern County District Attorney filed an amended information charging Ceja with: three counts of sexual intercourse or sodomy with a child under the age of 10 (Pen. Code,[1] § 288.7, subd. (a); counts 1, 2, & 3); two counts of oral copulation or sexual penetration of a child 10 years old or younger (§ 288.7, subd. (b); counts 4 & 5); continuous sexual abuse of a child (§ 288.5, subd. (a); count 6); two counts of committing a lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a); counts 7 & 8); and committing a lewd act on a child 14 years old, while Ceja was at least 10 years older than the child (§ 288, subd. (c)(1); count 9). All the offenses were alleged to involve Jaidyn R., born in September 2006,[2] with various dates alleged for the offenses.[3] The information further alleged two aggravating factors on all counts:

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Ceja was born on September 16, 1967.

[3]     The dates alleged for the offenses were: between September 22, 2013, and September 21, 2017, for count 1; between September 22, 2015, and September 21, 2017, for counts 2 and 3; between September 22, 2014, and September 21, 2015, for counts 4 and 5; between September 22, 2012, and September 21, 2020, for count 6; between September 22, 2013, and September 21, 2015, for counts 7 and 8; and October 3, 2020,

2.

the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)), and Ceja took advantage of a position of trust or confidence to commit the offense (*id*., rule 4.421(a)(11)).

Count 6 was dismissed on the prosecution's motion in the interests of justice prior to the jury's deliberations. On March 26, 2024, the jury found Ceja guilty on all the remaining counts and found true the two aggravating circumstances on all counts.

On April 24, 2024, the trial court sentenced Ceja to an indeterminate term of 105 years to life plus a determinate term of 10 years eight months consisting of the following terms, all consecutive: 25 years to life each on counts 1, 2, and 3; 15 years to life each on counts 4 and 5; the upper term of eight years on count 7; two years (one-third of the middle term) on count 8; and eight months (one-third of the middle term) on count 9.

Ceja filed a timely notice of appeal.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

Ceja and Ida T. were unmarried but in a long-term relationship and lived together. Ida's sister is Monica R., Jaidyn's mother. Ceja and Ida started their relationship before Jaidyn was born in 2006, and Ceja was part of the family's life since then.

Jaidyn spent a lot of time at Ceja and Ida's house while she was growing up. Jaidyn referred to Ceja as "Perico" or "Pico." Her private school was close to Ceja and Ida's house when she was in third and fourth grade, so she mostly spent the night there. Jaidyn had her own room at their house. In the mornings, she would eat breakfast and get ready for school, and then Ida took her to school.

Jaidyn was probably six years old when Ceja first touched her inappropriately. It

_____

for count 9. The date range for counts 7 and 8 was amended to September 22, 2013, and September 21, 2020, before the jury's deliberations.

3.

was Christmas and she was playing dress up with a cousin.  Ceja spun Jaidyn around, grabbed her by the vagina, and held her there.

Jaidyn spent time alone with Ceja at his house.  Ceja would be in her room while she was changing in the morning and would try to dress her although she was able to dress herself.  He touched Jaidyn while trying to put on her clothes by grazing her breasts and vagina.  Ceja sometimes made comments about Jaidyn's breasts or body including calling her breasts sexy when she was eight years old.

Ceja first touched Jaidyn's breasts when she was six or seven years old.  He would grab her breasts and specifically touch her nipples.  Jaidyn estimated Ceja touched her breasts 100 times between when she was six years old and when she was 14 as he did so almost any time Jaidyn saw him.

Ceja first touched Jaidyn's buttocks when she was six years old.  He would grab her buttocks with both hands and sometimes spank her.  Jaidyn estimated Ceja touched her buttocks 100 times between when she was six years old and when she was 14.

Jaidyn was closer to eight years old when Ceja first touched her vagina.  She estimated he touched her vagina around 50 times during the same age range he touched her other parts.  Jaidyn was probably eight years old when Ceja first put his fingers inside her vagina.  She did not understand what was happening and was afraid.  Jaidyn remembered Ceja putting his fingers in her vagina maybe 50 times.  While he put his fingers inside Jaidyn's vagina, Ceja usually touched his penis with his hands or lifted Jaidyn's shirt to look at her breasts.  Sometimes Ceja pulled Jaidyn's underwear and leggings down and put his mouth on her vagina while she was getting ready for school.  She was around nine years old the first time Ceja put his mouth on her vagina, which he did about 20 times until Jaidyn was 11 or 12 years old.

Jaidyn sometimes stayed at Ceja's house on the weekend, especially during the summer.  She slept in a shirt while staying there.  When Jaidyn was nine years old, Ceja woke her up and held her down on the floor.  She tried to kick him off, but he pushed her

4.

on the floor and started kissing her.  Ceja pulled up Jaidyn's shirt, kissing her stomach to her breast and telling Jaidyn this is how a boyfriend should wake a girlfriend up.

When Jaidyn was eight years old, she was eating breakfast and Ceja showed her pornographic material on his phone of a woman being massaged inappropriately.  Ceja told Jaidyn that the woman is going to be a smart girl when she grows up.

Jaidyn estimated Ceja put his penis inside her vagina around 30 times over the years until she was 11 or 12 years old.  She was nine years old the first time he did this.  Ida was not home at the time as she was still at work.  Jaidyn was staying the night at Ceja's house and was playing on Ceja's phone on the couch.  Ceja kneeled on the floor and pulled Jaidyn's pants down.  Jaidyn was looking at the phone when she felt a pain, looked down, and saw Ceja's penis.  She kicked Ceja when she felt his penis inside her.  This made Ceja mad, and he walked off.  Jaidyn was very confused and did not understand what was going on.  She went to her room, shut the door, and tried to sleep.  Another incident also occurred on the couch in the living room where Ceja put lotion on his penis as a lubricant and then put his penis inside Jaidyn's vagina.

Ceja told Jaidyn his actions were not a big deal, that he was just playing with her.  All Ceja's touching of Jaidyn occurred at his house.  Ida was at the house too but was in her room and did not see what Ceja was doing.  Jaidyn did not believe Ida knew about Ceja's inappropriate sexual contact.  Jaidyn stopped spending the night at Ceja and Ida's house when she was around 12 or 13 years old.  Ceja's personality changed after Jaidyn stopped coming to the house.  He stopped acting "like he was nice" and started being mean and rude.

Growing up, Monica saw Jaidyn as a cheerful little girl who loved dancing and singing.  Around the age of five or six years old, her parents noticed she began exhibiting fear and having nightmares that became increasingly real to her as she got older.  Jaidyn started having panic attacks around fifth grade.  She also began thinking about committing suicide.  Jaidyn saw a therapist and was given coping mechanisms and skills

for her anxiety. She began taking medications for her anxiety around the beginning of high school. Jaidyn had always been an "A" student, but her parents saw her grades start slipping in sixth grade.

When Jaidyn was around 12 or 13 years old, Ceja sent her flirtatious text messages. He called her pet names like baby and said "stuff" Jaidyn later did not consider normal for a grown man to be texting a little girl.

When Jaidyn was around 14 years old, she took a health class in school where she learned what a vagina and penis are, and about sexual intercourse. Jaidyn became aware the things that happened to her when she was little were not normal or okay. She already understood this the last time Ceja tried to touch her. Jaidyn was sitting on the couch when Ceja came over to her. He started touching her thighs and trying to touch her vagina. Jaidyn got up and tried to leave but Ceja followed her around the house. She tried to go up the stairs, but Ceja pretended they were playing a game and pulled her down the stairs to get Jaidyn to stay with him.

In October 2020, Jaidyn and her family moved into a new house. Diego C. was dating Jaidyn's older sister, Jamie, at the time and helped move Jaidyn's family. During the move, Diego saw Ceja pick Jaidyn up, grab her vagina, throw her up over his shoulder with one hand on her lower back and then place her back down. This made Diego uncomfortable because he felt it was inappropriate for Ceja to grab Jaidyn in her private part. After Ceja put Jaidyn back down, she seemed very uncomfortable and walked away. Only Diego saw this happen. Later that day, the family was in the office talking about how Jaidyn was growing up and Ceja commented that she was especially growing up "from her a[**]." This comment made Diego uncomfortable. Jaidyn came into the office minutes later and Diego saw Ceja stare her down from her breasts to her whole body. Diego told Jamie later what he saw although he did not want Jamie to tell her parents because he did not want to start any problems.

On October 24, 2020, Jaidyn woke up disoriented and scared in the middle of the night because she was having nightmares reliving Ceja's molestation. She ran out of her house. Jaidyn's father, Luther R., woke up Monica to let her know Jaidyn was not in her room. Monica called Jaidyn on her phone to ask where she was. Jaidyn was sitting in a field a few blocks from her house. Monica asked Jaidyn what she was doing and Jaidyn said she was "really sick." Monica told Jaidyn to come home as they were waiting for her. Luther went out looking for Jaidyn. He met her at the corner near their house, and they walked home together.

When Jaidyn was back home, Monica noticed Jaidyn was shaking and trying to calm herself down. Monica asked Jaidyn what was going on and she responded it was "really bad." Monica asked Jaidyn if someone had hurt her and she said yes. She asked if it was "Pico" and Jaidyn said yes. Monica thought it was Ceja because he had been doing construction work at their house and been alone there with Jaidyn.

Monica called the Bakersfield police to report Ceja. Detective Heather Lugo came to Jaidyn's house and interviewed Jaidyn about Ceja's abuse. Jaidyn showed Lugo text messages Ceja had sent to her. On October 27, 2020, Jaidyn went into the Bakersfield Police Department and was interviewed by Sergeant Joshua Deutinger. Jaidyn agreed to participate in pretextual calls that day to Ceja on her cell phone from the police department. During the calls, Jaidyn pushed Ceja to admit his molestation of her and apologize. Ceja denied he raped her but admitted he "did touch" Jaidyn. He told Jaidyn he "touched [her] vagina, but that's it," and claimed, "nothing went inside [her]." Ceja claimed he "just" touched her with his "hands." He "apologize[d] for everything [he] did." Ceja repeatedly claimed he did not remember molesting Jaidyn and did not know what happened as "sometimes [his] brain do[es]n't work." The pretextual calls were played for the jury.

On the evening of October 27, 2020, Bakersfield police arrested Ceja at his house. Police attempted to interview Ceja that night but decided to terminate the interview

because Ceja had been drinking alcohol before he was arrested. The next morning, Deutinger and another officer interviewed Ceja after advising him of his *Miranda*[4] rights. Audio and video of the interview were recorded with a body-worn camera and the recording was shown to the jury. Ceja repeatedly claimed during the interview he did not remember doing anything to Jaidyn and denied touching her inappropriately.

On October 30, 2020, a forensic nurse, Sarah Cooper, conducted a sexual assault response team (SART) examination of Jaidyn. Jaidyn told Cooper that Ceja's molestation began when she was eight years old. In response to Cooper's questions, Jaidyn said Ceja penetrated her with his penis, kissed her neck, breasts, and vagina, and put lotion on her vagina. Cooper conducted a head-to-toe physical examination of Jaidyn and a nonintrusive genital examination. Cooper did not see any sexual assault-related findings of a nonacute nature. She testified it is rare to find historical injuries when the sexual assault occurred more than 10 days before the examination. Cooper explained that the lack of genital injury does not mean the events described by Jaidyn did not happen.

Ceja was held in jail after his arrest. On the morning of December 3, 2020, Ceja was discovered laying on his bunk in his jail cell with an approximately one-inch laceration to his right forearm and a broken razor. There was blood on his arm and the floor. The deputy who found Ceja believed he tried to commit suicide. The deputy requested medical assistance, and Ceja was taken to the infirmary. Ceja was subsequently put on suicide watch and placed in a smock designed to prevent self-injury.

## II. Defense Evidence

Ceja testified on his own behalf. He confirmed he and Ida babysat and took care of Jaidyn while she was growing up. Jaidyn was like Ceja's "little girl," and he was her "Daddy Number 2." Ceja repeatedly denied Jaidyn's allegations that he touched her sexually.

---

[4]    *Miranda v. Arizona* (1966) 384 U.S. 436.

Ceja admitted he tried to commit suicide while in jail but said his suicide attempt was unrelated to the alleged molestation. Ceja testified he wanted to kill himself because of his depression, Ida, and belief he was going to die soon. He was upset because he lost his business, his relationship with Ida, and his house because of his arrest. Ceja was also upset he was being accused of being a child molester. He had an aneurism around 2016 after which he had issues with his vision.

## DISCUSSION

### I. Physical Restraints

Ceja argues the trial court abused its discretion by allowing him to remain in feet and leg restraints without an on-the-record showing of manifest need. He contends this prejudicial error resulted in a miscarriage of justice, violated his Fourteenth Amendment right to due process, and contributed to the verdicts.

### A. Additional Background

On March 5, 2024, the first day of trial, defense counsel noted before the trial court that Ceja declined to dress in street clothing and wanted to wear jail clothing during the trial. Counsel confirmed he had given Ceja his professional advice on doing so and advised Ceja that street clothing could be provided to him at no cost. Ceja confirmed to the court he wished to wear his jail clothing.

On March 11, 2024, during jury selection but outside the jurors' presence, the trial court told the bailiff to remove Ceja's arm and waistband shackles, but his feet restraints were to remain. The court explained that Ceja must kneel on the chair for the deputy to unlock the feet restraints which was difficult for Ceja due to his "handicap,"[5] so Ceja told the deputy to just leave on the feet restraints. The court indicated there was a wood panel on counsel's table so the jury should not be able to see the restraints. Defense counsel made no objection.

---

[5] The record does not reflect what "handicap" Ceja suffered from.

On March 18, 2024, outside the jury's presence, the trial court indicated Ceja did not want his wrist chains off, but the court insisted they be removed due to the chains' potential noise and risk the jury might see them. Defense counsel acquiesced to the court's offer to instruct the jury using CALCRIM No. 204 regarding jail clothing and restraints. The court stated that the previous week, alternate juror number four walked into the courtroom to retrieve her lunchbox at the same time Ceja was being led out in chains. The court spoke with alternate juror number four separately from the other jurors about what she may have seen while retrieving her lunchbox. The juror said she "didn't even pay attention." She confirmed she would not hold it against Ceja if she saw him in chains indicating he was in sheriff's custody. After all the jurors returned to the courtroom, the court instructed the jury with a modified version of CALCRIM No. 204 before opening statements were given.

Just before Ceja's testimony and outside the jury's presence, the trial court stated Ceja would be seated on the witness stand to testify before the jury was brought into the courtroom and his leg chains would be hidden from the jury's view behind a privacy panel. The court noted Ceja was not in waist or arm chains, and the leg chains would be removed if Ceja wishes. Defense counsel made no objection.

The trial court's instructions to the jury before deliberations included a modified version of CALCRIM No. 204: "The fact that Mr. Ceja is in jail clothing or that physical restraints may have been placed on him is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations."[6]

---

[6]     The same language was used when the trial court gave a modified CALCRIM No. 204 before opening statements.

10.

**B.    Applicable Law**

A " 'trial court has broad power to maintain courtroom security and orderly proceedings' " including the discretion to impose physical restraints on a defendant. (*People v. Stevens* (2009) 47 Cal.4th 625, 632.)  However, "visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community.  [Citation.]  The same problem arises if the defendant is required to appear before the jury dressed in prison clothing.  [Citations.]  In addition to their prejudicial effect on the jury, shackles may distract or embarrass a defendant, potentially impairing his ability to participate in his defense or serve as a competent witness on his own behalf."  (*Id*. at pp. 632–633.)

Because of these risks, the trial " 'court's discretion to impose physical restraints is constrained by constitutional principles.  Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints."  [Citation.]  Similarly, the federal "Constitution forbids the use of visible shackles … unless that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." ' "  (*People v. Bell* (2019) 7 Cal.5th 70, 123; *People v. Duran* (1976) 16 Cal.3d 282, 290–291 (*Duran*); *Deck v. Missouri* (2005) 544 U.S. 622, 624.)  These principles have been applied to the use of a stun belt even if this device is not visible to the jury.  (*People v. Mar* (2002) 28 Cal.4th 1201, 1219.)

"The decision of a trial court to shackle a defendant will be upheld by a reviewing court in the absence of an abuse of discretion.  [Citations.]  When the record does not reflect 'violence or a threat of violence or other nonconforming conduct' by the defendant, a trial court's order imposing physical restraints will be deemed to constitute an abuse of discretion."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 987.)

11.

### C. Analysis

Preliminarily, the Attorney General argues any claimed error in leaving on Ceja's restraints was invited by Ceja's affirmative acceptance of the continued use of concealed leg restraints, as well as his acceptance of the trial court's remedial measures. We agree. " 'Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error.' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 821–822 (*Holmes*).) As the Attorney General points out, Ceja's feet restraints were left on during trial at his request. The court insisted the wrist and arm restraints must at least be removed and confirmed the feet restraints were not visible to the jurors as they were obscured by a wood panel. When Ceja testified, he was placed on the witness stand before the jurors were brought in so his restraints would remain concealed. The jury was also instructed not to consider the fact that Ceja may have been in restraints as evidence in deciding the issues. Ceja cannot complain on appeal the court erred in leaving on his restraints when the court did so at his request and took remedial measures that Ceja's counsel either acquiesced to or requested.

We reject Ceja's argument he did not invite the error because he "did not restrain himself," and his counsel did not cause the restraint error. It is "established that it is legally permissible to transport a prisoner to the courtroom in physical restraints." (*People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1141.) The issue is not *who* restrained Ceja; rather, the issue is whether the trial court erred by leaving on the feet restraints after Ceja was transported to the courtroom. The court's stated practice was to "always unshackle our defendants," but the court expressly left on the feet restraints at Ceja's request. There was no abuse of discretion in accommodating Ceja's decision to remain in restraints, and the court took appropriate remedial measures to counter the potential risk of prejudice from their continued use.

12.

Regardless of whether Ceja *invited* the error, he neither objected to the restraints nor asked the trial court to rule on if there was a manifest need for them. "It is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 (*Tuilaepa*), disapproved on another ground in *People v. Harris* (2008) 43 Cal.4th 1269, 1311.) The trial court cannot be faulted for failing to make an on-the-record determination of the manifest need for restraints when Ceja did not object to their continued use. (*People v. Ward* (2005) 36 Cal.4th 186, 206 ["In the absence of an objection, the trial court had no opportunity to set forth the reasons it was deemed necessary for defendant to wear leg braces in the courtroom."]; *People v. Ramirez* (2006) 39 Cal.4th 398, 450 [the defendant did not preserve issue for appeal where he chose to wear leg chains and did not press the court to rule on their necessity].) Ceja's failure to object forfeits the issue on appeal. (*Holmes*, *supra*, 12 Cal.5th at p. 821; *People v. Bell*, *supra*, 7 Cal.5th at p. 123; *Tuilaepa*, at p. 583; *Duran*, *supra*, 16 Cal.3d at p. 289.)

Even if the issue was preserved, Ceja has not demonstrated any error in keeping on his feet and leg restraints was prejudicial. Our Supreme Court has "consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson* (2001) 25 Cal.4th 543, 596; *Tuilaepa*, *supra*, 4 Cal.4th at pp. 583–584.) Here, the record reflects one alternate juror may have seen Ceja's restraints when she returned to the courtroom while Ceja was being led out in restraints. "Prejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen.' " (*Tuilaepa*, at p. 584; *People v. Cunningham*, *supra*, 25 Cal.4th at p. 988 ["Brief glimpses of a defendant in restraints have not been deemed prejudicial."]; *Duran*, *supra*, 16 Cal.3d at p. 287, fn. 2.) The alternate juror's response to the trial court's questioning indicates she did not actually see the restraints, and she

confirmed she would not hold this against Ceja. One alternate juror's brief possible glimpse of Ceja's restraints does not constitute prejudicial error.

Ceja contends the jurors knew he was restrained, and it is reasonable to infer his restraints were visible to the jury because the trial court told the alternate juror he was in "chains" or "shackles," and twice instructed the jury he had physical restraints. We disagree. The court instructed the jury with a modified version of CALCRIM No. 204 to disregard the fact that "Ceja is in jail clothing *or* that physical restraints *may have been* placed on him" in their deliberations. (Italics added.) This equivocal language did not disclose Ceja was wearing restraints, particularly given the instruction also referenced his jail clothing. Ceja declined to dress out in street clothes and wore his jail clothing during trial. His clothing was doubtless visible to the jury and Deutinger during his testimony identified Ceja by his jail attire. But nothing indicates the jury saw Ceja's restraints during trial as the record reflects they were obscured by the table's wooden panel during the prosecution's case and the witness stand during Ceja's testimony. Ceja's claim "wearing feet and leg restraints reasonably had at least some damaging effect on his demeanor while testifying" is unsupported by the record and speculative. (*People v. Waidla* (2000) 22 Cal.4th 690, 735 [speculation is not evidence].)

In conclusion, the trial court did not abuse its discretion by leaving on Ceja's feet and leg restraints at his request without an on-the-record determination of whether there was a manifest need for the restraints, and any error in doing so was not prejudicial.

## II. Admission of Suicide Attempt Evidence

Ceja argues the trial court erroneously admitted evidence of his suicide attempt while in custody because the evidence was irrelevant and prejudicial. He contends there is a reasonable chance, more than an abstract possibility, of different verdicts if this evidence had not been introduced.

### A. Additional Background

In the prosecution's trial brief, the prosecutor moved in limine to admit evidence

14.

of Ceja's suicide attempt while in jail as relevant evidence of the underlying offenses. The brief noted Ceja made the following statements to detectives during his police interview on October 28, 2020: "You can kill me"; "Kill me"; and "I wish you guys can kill me."

On March 6, 2024, the trial court held a hearing on in limine motions. In addition to Ceja's suicide attempt in jail, the prosecutor also requested to admit the pretextual calls wherein Ceja made comments to Jaidyn that she could kill him. Defense counsel argued the evidence of Ceja's suicide attempt did not necessarily indicate consciousness of guilt. He further argued it did not indicate anything other than Ceja was in jail and suicidal, which may have nothing to do with whether there was any sexual contact between him and Jaidyn. Counsel averred this evidence was "certainly more prejudicial than probative."

The trial court found Ceja's suicide attempt was admissible as evidence of his consciousness of guilt. The court acknowledged the evidence was prejudicial but found the attempt tied in with Ceja's comments during the pretextual call that Jaidyn could kill him. The court concluded the evidence would not create any additional prejudice or confuse the issues, and was probative of consciousness of guilt. The court allowed the prosecution to introduce evidence of Ceja's suicide attempt limited to "just the basic facts that substantiate that from" the jail facility.

As summarized above, a deputy from the jail testified Ceja was found bleeding in his cell, was given medical assistance, and subsequently placed on suicide watch. An inmate alerted the deputy that Ceja had cut himself and was bleeding. The deputy put the inmates on lockdown for his and the medical staff's safety and security. The deputy took five photos of the scene, and the photos were admitted at trial. This included a photo of a broken razor, which the deputy confirmed was contraband as the inmates were not supposed to have any sharp instruments.

In his testimony, Ceja said he was sad when he tried to kill himself in jail and

15.

denied he tried to commit suicide because he had molested Jaidyn. He testified he was thinking about Ida, that he was going to die, and for him "to go to somewhere else." As a result of being arrested, Ceja lost his business, his relationship with Ida, and his house. Ceja was also upset he was accused of being a child molester.

The trial court instructed the jury with CALCRIM No. 378: "If the defendant tried to commit suicide, that conduct may show that he was aware of his guilt. If you conclude that the defendant tried to commit suicide, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant tried to commit suicide cannot prove guilt by itself."

During closing argument, the prosecutor argued Ceja tried to kill himself because he knew he molested Jaidyn. The prosecutor averred Ceja showed consciousness of guilt by the suicide attempt and his comments to Jaidyn during the pretextual calls that she can kill him. Defense counsel countered in his closing argument that Ceja was suicidal because he was being held in jail as a child molester and had lost everything including his house and business. He argued the suicide attempt could just be based on Ceja's depression, desire not to be in jail anymore, and reported wish to go to a better place.

## B. Applicable Law

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) But even relevant evidence may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla*, *supra*, 22 Cal.4th at p. 724.)

"Evidence showing consciousness of guilt … is generally admissible within the

16.

trial court's discretion." (*People v. Anderson* (2018) 5 Cal.5th 378, 391.) "While physical flight to evade capture or escape from custody are two obvious examples of relevant conduct, the courts have long held ' "[a]*ny conduct* of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible …." ' [Citation.] '[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference [of consciousness of guilt].' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497–498 (*Pettigrew*).)

" 'The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value.' " (*People v. Jones* (2011) 51 Cal.4th 346, 373 (*Jones*).) A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

### C.     Analysis

Ceja argues the evidence of his attempted suicide was irrelevant because it did not have a tendency in reason to prove the disputed fact of whether he molested Jaidyn. He claims the prosecutor's speculative inferences about the attempted suicide in closing argument did not establish relevant evidence. Ceja contends the evidence had only slight probative value and introduced highly prejudicial evidence about the jail facility's response to the suicide attempt and inflammatory other act conduct.

It has long been understood that " '[a]ny conduct of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible ….' " (*People v. Butler* (1970) 12 Cal.App.3d 189, 193.) Pursuant to this rule, the *Butler* court upheld the admissibility of testimony the defendant had cut his arm on the night of his arrest as evidence showing consciousness of guilt. (*Ibid.*)

More recently, the court in *Pettigrew* discussed the admissibility of suicide attempt evidence in the context of an instructional error claim. The defendant in *Pettigrew* argued on appeal the trial court prejudicially erred by instructing the jury with CALCRIM

No. 372, the standard flight instruction,[7] that they could consider his two suicide attempts while in jail as consciousness of guilt. (*Pettigrew*, *supra*, 62 Cal.App.5th at pp. 488, 495.) The court concluded the trial court erred by giving CALCRIM No. 372 because there was no substantial evidence of flight. The court nonetheless concluded the trial court would have been justified in instructing the jury on the limited use it could make of the defendant's suicide attempts. (*Id*. at pp. 499–500.) In reaching this conclusion, the court observed that, in addition to *Butler*, courts have "recognized that evidence of a defendant's attempted suicide after the commission of a crime constitutes relevant circumstantial evidence of guilt if the evidence supports an inference that the suicide attempt was an effort to evade prosecution. (*People v. Sorrentino* (1956) 146 Cal.App.2d 149, 161 ['There was also evidence of consciousness of guilt on the part of appellant, since he stated that he would have committed suicide if the officers had not taken his gun.']; *Hall v. Scribner* (N.D.Cal. 2008) 619 F.Supp.2d 823, 845 [on federal habeas corpus, finding persuasive state appellate court's holding that error in prosecutor's closing argument, if any, was harmless beyond a reasonable doubt considering evidence from which the jury was ' "virtually certain" ' to draw inferences of consciousness of guilt, ' "[t]he first and most dramatic of these [being] defendant's attempted suicide the day before [his] interview [with police]" ']; see generally 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 119, p. 951 ['Evidence that the defendant attempted suicide after committing the alleged crime or being arrested may be admitted to show consciousness of guilt.'].)" (*Pettigrew*, at pp. 497–498.) In a footnote, the *Pettigrew* court further observed that "[o]ur Supreme Court has similarly recognized, albeit

---

[7] The jury in *Pettigrew* was instructed with CALCRIM No. 372 as follows: " 'If the defendant fled or tried to flee after he was accused of committing a crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct; however, evidence that the defendant fled or tried to flee cannot prove guilt by itself.' " (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 496.)

18.

indirectly, that a postoffense suicide attempt is relevant to prove the defendant's consciousness of guilt. (*People v. Panah* (2005) 35 Cal.4th 395, 482 [Trial court properly excluded evidence of defendant's suicide attempt four years *before* the alleged crime, despite defendant's assertion it was relevant to 'negate any inference of consciousness of guilt from his suicide attempt … the morning *after* the crime.' (italics added)]; *People v. Carter* (1957) 48 Cal.2d 737, 748 [Where '[t]he prosecution relied on defendant's attempted suicide as evidence of a guilty mind, and thus as indirect evidence that defendant had administered the beating to [the victim],' the trial court erred by excluding rebuttal evidence of defendant's statements to a doctor explaining why he tried to kill himself.].)" (*Pettigrew*, at p. 498, fn. 5.)

Based on this case law, we conclude the trial court correctly found the evidence of Ceja's suicide attempt was relevant on the disputed fact of whether Ceja molested Jaidyn. Taken together with Ceja's comments during the pretextual calls that Jaidyn could kill him, as well as his similar comments to detectives, this evidence was probative on his consciousness of guilt. The court's finding on the evidence's relevance is not undermined by the prosecutor's purportedly "speculative inferences" about how the jury should interpret the suicide attempt because the court ruled on the evidence's admissibility before closing arguments. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070 ["A reviewing court 'focuses on the ruling itself and the record on which it was made. It does not look to subsequent matters .…' "], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 822–823.) The prosecutor in any event has wide latitude to comment on the evidence during argument (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480) and defense counsel countered the prosecutor's argument by offering alternative explanations for Ceja's suicide attempt in his own closing argument. That the evidence was subject to competing interpretations did not render it inadmissible as "the existence of alternate explanations for the defendant's behavior does not necessarily defeat the court's discretion to admit consciousness-of-guilt evidence." (*People v. Anderson*, *supra*,

5 Cal.5th at p. 391.)

Ceja argues evidence showing the "bloodied, disruptive conduct" in the jail resulting from his suicide attempt was inflammatory. We disagree. The evidence about the disruption the attempt caused in the jail facility and the photo of Ceja's blood in the cell were no more inflammatory than the evidence about Ceja's prolonged molestation of a child. The suicide attempt evidence was also limited as the trial court expressly ruled the prosecutor may present only enough evidence to substantiate it. The jail deputy's testimony consisted of only eight pages of the reporter's transcript. The jury was instructed on the proper purpose for which the suicide attempt evidence could be considered, and we presume the jury followed that instruction. (See *Jones*, *supra*, 51 Cal.4th at p. 371 [evidence was properly admitted under Evidence Code section 352 where it was presented quickly, the parties did not dwell on it, the evidence was not particularly inflammatory given the facts of the charged offenses, and the jury was instructed on the evidence's proper purpose]; *Holmes*, *supra*, 12 Cal.5th at p. 752 [jurors are presumed to follow instructions].)

Ceja claims the photo showing he had contraband in jail introduced other act evidence and suggested he had a propensity to violate the law. Evidence of prior acts directed solely at showing a defendant's criminal propensity is generally inadmissible unless relevant to show a material fact. (*Jones*, *supra*, 51 Cal.4th at p. 371; Evid. Code, § 1101, subd. (b).) But the evidence showed only that Ceja violated the jail facility's rules, not necessarily that he committed a crime. A single violation of the jail's rules does not logically render Ceja criminally inclined. Moreover, the suicide attempt evidence was not admitted for the purpose of showing Ceja's propensity for criminality but instead presented as indicating his consciousness of guilt for molesting Jaidyn and the jury was so instructed on the evidence's purpose. As discussed above, this was relevant on the material fact of whether Ceja molested Jaidyn.

In sum, the trial court did not abuse its discretion by admitting the suicide attempt

20.

evidence.

### D. Harmless Error

Even if we assume the admission of the suicide attempt evidence was error, the error was harmless and does not require reversal. "A trial court's determinations under Evidence Code section 352 do not ordinarily implicate the federal Constitution, and are reviewed under the 'reasonable probability' standard of *People v. Watson* (1956) 46 Cal.2d 818." (*People v. Gonzales* (2011) 51 Cal.4th 894, 924.) Under the *Watson* test, "[t]he reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) When applying the *Watson* standard, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177, italics omitted, disapproved of on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 255.)

Ceja has not shown a reasonable probability of different verdicts if the suicide attempt evidence was excluded. Even without this evidence, strong evidence supported Ceja's guilt for molesting Jaidyn. Jaidyn testified at length and in detail about his sexual abuse over several years. Her testimony was corroborated by other circumstantial evidence. Monica testified to Jaidyn's extensive contact with Ceja and her behavioral changes as Jaidyn grew older including her anxiety, nightmares, and decline in school grades. Diego testified about Ceja's inappropriate conduct toward Jaidyn by grabbing her vagina and staring at her in a lecherous way. Though Ceja denied the molestation allegations in his testimony, he admitted he had touched Jaidyn's vagina during the pretextual calls.

We acknowledge, as Ceja points out, that Cooper found no sexual assault-related findings during the SART examination. But Cooper explained such findings are rare if

the assault was more than 10 days before the examination and the lack of such findings did not refute Jaidyn's allegations. Cooper's testimony therefore neither supported nor negated the allegations.

Ceja's arguments the admission of the suicide attempt evidence rendered his trial fundamentally unfair and violated his federal constitutional rights are meritless. This evidence is not " 'of such quality as necessarily prevents a fair trial.' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) And this case is not plausibly characterized as "the rare and unusual" one where the admission of evidence violated the defendant's federal due process right and rendered the trial fundamentally unfair. (*Id*. at p. 232; *People v. Partida*, *supra*, 37 Cal.4th at p. 439 [the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair].)

In conclusion, we reject Ceja's abuse of discretion and constitutional due process arguments regarding the trial court's admission of the suicide attempt evidence.

## **DISPOSITION**

The judgment is affirmed.


HARRELL, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.